UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

REUBEN VAUGHN and STEVEN DAVIS,

       Plaintiffs,

vs.                                   CASE NO.:  1:14-CV-00012-MW-GRJ

PRODUCERS AGRICULTURE
INSURANCE COMPANY, a foreign
corporation,

       Defendant.

_____/

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, PRODUCERS AGRICULTURE INSURANCE COMPANY ("Defendant" or "ProAg"), by and through its undersigned attorneys and pursuant to Federal Rule of Civil Procedure 56 and this Court's Scheduling and Mediation Order (Doc. 18), hereby files its memorandum in opposition to the Motion for Partial Summary Judgment ("Motion") filed by Plaintiffs REUBEN VAUGHN and STEVEN DAVIS (together, "Plaintiffs"), and states:

### Background

This litigation concerns federally reinsured insurance policies (the "Policy") issued by ProAg to each of the Plaintiffs for the 2011 crop year. The extensive factual and procedural background has been set forth in Defendant's previously-filed Motion to Dismiss Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) or Alternatively, for Summary Judgment (the "Motion to Dismiss"; Doc. 11, pp. 3-10). For ease of reference, Defendant re-states certain factual background in conjunction with the

arguments set forth below.

In their Motion (Doc. 32), Plaintiffs seek judgment as a matter of law determining that: (1) Plaintiffs are entitled to a presumption of bad faith; (2) the Court has jurisdiction to conduct judicial review of the arbitration award previously entered for the purpose of rendering the two-part determination under Section 20(i); and (3) Plaintiffs' Section 20(i) request to RMA satisfies the threshold requirement of judicial review. It is axiomatic that in determining whether a moving party has met its burden of establishing that it is entitled to summary judgment, the court considers all inferences drawn from the underlying facts in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the movant. *See Furmanite America, Inc. v. T.D. Williamson, Inc.,* 506 F. Supp. 2d 1134, 1138 (M.D. Fla. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505 (1986)). If a reasonable fact finder could draw more than one inference from the facts, that inference creates an issue of material fact which will preclude summary judgment. *Id.* As set forth herein, Plaintiffs cannot meet this standard, and summary judgment must be denied.

I.     **Plaintiffs Are Not Entitled To A Presumption Of Bad Faith.**

    A.     **Plaintiffs Mis-state the Sequence of Events.**

Count II attempts to state a claim for "Breach of Florida Statutes § 625.155 [sic] and § 626.9541." Although Plaintiffs do not specify which provisions of Section 626.9541 are applicable, they allege that: "Defendant's own field adjusters demanded repayment of the indemnity previously paid" (Doc. 1, ¶ 21); and that "As a result of the Defendant's lack of communication and ultimate denial of the subject claim, the

Plaintiffs filed a Consumer Assistance Request ("CRN") with the Florida Treasurer and Insurance Commissioner on November 6, 2012." Doc. 1, ¶ 22. Plaintiffs then allege that "*Thereafter*, due to Defendant's wrongful and punitive action and ultimate denial of the subject claims, the Plaintiffs demanded arbitration in accordance with the terms of the insurance policy and the matter proceeded to arbitration." Doc. 1, ¶ 23 (emphasis added).

The undisputed facts demonstrate that this alleged sequence of events is simply inaccurate. Plaintiffs made their arbitration demand May 1, 2012, over six months before they submitted the CRNs. *See* Doc. 1-6, ¶ 7. The parties actively engaged in the arbitration process, including extensive formal discovery. Plaintiffs served their CRNs on Defendant during this process on November 8, 2012, about one month before the final arbitration hearing. At that time, Plaintiffs were of course aware that Defendant was participating in the arbitration process mandated by federal regulations, and that Defendant sought repayment of previous indemnities paid, and had denied the remaining Davis claim, on the basis that the Plaintiffs' cabbage was uninsurable processing cabbage (*See* Doc. 1-6, ¶ 5). Plaintiffs were further aware that the RMA itself had investigated the subject cabbage claims and concluded in the Eastern Regional Compliance Office's reports of February and March 2012 that Plaintiffs' crops were uninsurable. *See* Arbitration Exhibits 45 and 46 (Doc. 11-6). The factual record reveals Plaintiffs' allegation that they demanded arbitration *after* filing their CRNs is incorrect, and that the parties were in fact engaged in that dispute resolution process set forth in the Policy at the time of the CRN filing.

**B.     Plaintiffs' CRNs are Fatally Flawed and Therefore Null.**

In the bad-faith context, "a claimant that fails to adhere to the notice requirements of § 624.155 cannot state a claim for relief under that statute." *Rousso v. Liberty Surplus Ins. Corp.*, No. 10-cv-20554, 2010 WL 7367059, *3 (S.D. Fla. Aug. 13, 2010). An important element required in a CRN is providing an insurer with a proposed solution to remedy any alleged shortcomings of the insurer's obligation under the policy. *Id.* at *5. A proposed solution that is the "functional equivalent of 'pay me everything I've asked for'" does not meet the requirements of the statute. *Id.*

In their respective CRNs (Doc. 32-1), Plaintiffs demanded: (1) abatement of ProAg's demand of overpayment of indemnity and removal of insureds from the FCIC Ineligible Tracking List ("ITS"); (2) additional indemnity under a subsequent claim for Davis and a claim by Vaughn made as to a different crop; (3) reimbursement for attorneys' fees and costs; and (4) for each Plaintiff, consequential damages in the amount of $500,000 and punitive damages in the amount of $500,000 (total of $2MM). These CRNs did not provide ProAg a real opportunity to cure any alleged Policy violation, and therefore do not meet statutory requirements, for several reasons.

First, they demanded vast sums of money beyond the additional indemnity they claimed was owed to Davis (which the arbitrator subsequently found to be only approximately $28K, including interest). The purported "cure" set forth in Plaintiffs' CRNs would have required ProAg to pay Plaintiffs' attorneys' fees and costs, and punitive and consequential damages totaling $1 million each. Doc. 32-1. It would be difficult to conceive of a more clear example of "pay me everything I've asked for" than

the Plaintiffs' CRNs. Such a "cure" demand is inconsistent with the purposes of Section 624.155, Florida Statutes. *See, e.g., Rousso* No. 10-cv-20554, 2010 WL 7367059, at *5. As the Florida Supreme Court has acknowledged:

> If the insurer may avoid a bad faith action only by paying in advance of trial every penny of the damages that it faces if it loses at trial, the insurer would have no reason to pay. . . . Section 624.155(2)(d) would have no effect or purpose under such an interpretation. The law does not support such an expansive and illogical reading of Fla. Stat. Ann. § 624.155(2)(d).

*Talat Enter., Inc. v. Aetna Cas. & Sur. Co.,* 753 So. 2d 1278, 1282 (Fla. 2000) (quoting *Talat Enter., Inc. v. Aetna Cas. & Sur. Co.,* 952 F. Supp. 773, 778 (M.D. Fla. 1996)). Plaintiffs' Motion likewise advances the same flawed reading of the statute, and their CRNs do not meet the requirements of § 624.155.

Secondly, Plaintiffs' CRNs are defective because they demanded relief that ProAg was not able or authorized to provide under the terms of the federal regulations governing the Policy, certainly not before the resolution of the pending arbitration between the parties. The terms and conditions of the federally reinsured crop insurance policies are prescribed by the FCIC's regulations, *see, e.g.,* 7 C.F.R. § 457.8 (Basic Provisions), and "may not be waived or varied in any way." *Id.* § 457.8 (Preamble). Each reinsured policy must contain a provision stating it is "reinsured by the [FCIC] under the provisions of the [FCIA]," and "all provisions of the policy and rights and responsibilities of the parties are specifically subject to the Act." *Id.* Each of the terms of a federally-reinsured crop insurance policy is, therefore, a matter of substantive federal law.

The FCIC makes reinsurance available to approved providers ("AIPs") under a

Standard Reinsurance Agreement ("SRA").  7 C.F.R. § 400.164.  AIPs must "follow all applicable Corporation procedures in [their] administration of the crop insurance policies reinsured." *Id.* § 400.168(a).  Pursuant to the SRA, Appendix IV, Section IV, ProAg was obligated to report its suspicions that Plaintiffs' cabbage was uninsurable processing cabbage to the FCIC.  2011 Standard Reinsurance Agreement, Appx. IV, § IV, p. 15. Moreover, an AIP must provide "all information that the Corporation may deem relevant in the administration of the Agreement, including a list of all applicants determined to be ineligible for crop insurance coverage and all insured producers cancelled or terminated from insurance, along with the reason for such action, the crop program, and the amount of coverage for each." 7 C.F.R. § 400.168(c).  Thus, ProAg was fulfilling its duty under the crop insurance program in reporting Plaintiffs to the RMA after ProAg was provided the contract that they entered committing their cabbage crops, before they were planted, to be processed into sauerkraut[1], and also when the Plaintiffs failed to return the previously paid indemnities.

Additionally, the RMA conducted its own investigation, and determined that Plaintiffs' cabbage was uninsurable processing cabbage. *See* Arbitration Exh. 46 (Doc. 11-6).  This underscored ProAg's obligation to require repayment of the indemnity that had previously been paid to Plaintiffs, and report Plaintiffs' failure to repay said indemnity. *See* Basic Provisions, § 6(h).  At the time they filed the CRNs, Plaintiffs

---

[1] The Parties stipulated to the following in the arbitration as undisputed facts.  On November 3, 2010, Plaintiffs entered into a written contract with Great Lakes Kraut Company ("GLK") for their 2011 cabbage crop before they were planted, and the GLK contract is a "processing contract" as defined in the Policy. ProAg first received a copy of the GLK contract on June 23, 2011, after ProAg had adjusted and processed the indemnity payments on Claim ##s 1138 & 902. *See* Joint Pretrial Statement in Arbitration (Doc. 11-3).

-6-

knew of the RMA's findings that the Plaintiffs' crops were uninsurable and knew of the pertinent regulations and SRA which governed ProAg's actions and the parties' dispute.

During the pendency of the arbitration proceeding, shortly before the final hearing, two FADs were also issued by the RMA: FAD-166 on September 12, 2012, and FAD-170 on October 4, 2012. The FADs are available at htt://www.rma.usda/gov/regsindex.html. While Plaintiffs cited both FADs in their CRN apparently as support for their contention that their cabbage was insurable, the RMA's representative (and investigator) testified in his deposition on November 13, 2012 (after the CRNs), that these FADs did *not* change the results of the RMA's investigation that the Plaintiffs' cabbage was uninsurable. *See* Deposition of Brian Roshitsh, 23:16-23, attached hereto as Exhibit "1."

The circumstances giving rise to ineligibility and an AIP's reporting requirements are governed by federal regulations, and ProAg had no discretion or ability to alter Plaintiffs' status upon their refusal to re-pay indemnities. *See* 7 C.F.R. § 400, Subpart U. Moreover, it is the RMA, not ProAg, that establishes and maintains the ITS list, as governed by federal regulations. *See id.* In the event the insured disputes the determination that a delinquent debt is owed, a determination must be made through the appropriate dispute resolution mechanism before the insured is removed from the ITS list. *See, e.g.,* 2011 Ineligible Tracking System Handbook, p. 8, available at http://www.rma.usda.gov/handbooks/24000/2011/24050.pdf, pertinent pages of which are attached hereto as Exhibit "2" ("Binding arbitration or disputes that are not resolved before the termination date or other due date does not relieve the person of the

requirement to pay the debt on or before the termination date or other due date, and will not delay a person being certified to RMA, listed as ineligible, and issued a Notice of Ineligibility by RMA."). ProAg was thus unable to comply with Plaintiffs' demand that it remove Plaintiffs from the ITS list. Plaintiffs could only be removed from the ITS list by the RMA, and given the conclusions of RMA's own investigation, that could only be requested following the outcome of the dispute resolution mechanism set forth in the Policy—i.e., the arbitration that was well underway when Plaintiffs filed the CRNs.

The timing of Plaintiffs' CRNs also appears designed to expire before the arbitration resolved the parties' dispute. Sixty days from the November 8, 2012 service of the CRNs ran on January 7, 2013. The final arbitration hearing was held on December 11-12, 2012, and the parties' proposed awards were understandably due after the Christmas and New Year holidays on January 15, 2013. The Arbitration Award resolving the dispute was issued on January 31, 2013. In the context of the RMA's previous finding that Plaintiffs' cabbage was uninsurable, it appears that Plaintiffs were not really trying to provide Defendant with sixty days to cure when they served their CRNs. Instead, they were trying to place Defendant "between a rock and a hard place" even while both parties were engaged in the dispute resolution process mandated by the Policy. Plaintiffs were apparently using the CRN process to try and parlay their claims, which were at that time already being arbitrated, into "bad faith" claims. At the very least, they were using the CRN process to place ProAg in an impossible situation where a federal agency's determinations precluded it from acting at all, unless and until the arbitrator resolved the issue of insurability differently. Such gamesmanship is outside

any purpose for § 624.155 and should not be sanctioned by this Court.

Thirdly, any attempt by ProAg to respond to the CRNs further than it did would have been premature before the conclusion of the arbitration process that would settle the dispute about whether the cabbage was intended to be for fresh market (insurable) or processing into sauerkraut (uninsurable) and the amount of any remaining indemnity owed. A cause of action for bad faith failure to settle is premature unless there has been a determination of liability and the extent of the damages owed the insured under the first-party insurance policy. *316, Inc. v. Maryland Casualty Co.*, 625 F. Supp. 2d 1187, 1193 (N.D. Fla. 2008) (citing *Old Republic Nat. Title Ins. Co. v. Home American Credit, Inc.*, 844 So. 2d 818 (Fla. 5th DCA 2003)). Although no state or federal court in Florida has determined whether a CRN itself is premature before an arbitration has concluded, a lawsuit is clearly premature prior to conclusion of an arbitration. *See 316, Inc.*, 625 F. Supp. 2d at 1193 (citing *Talat Enter. v. Aetna Life & Cas.*, 952 F. Supp. 773 (M.D. Fla. 1996)).

In *316, Inc.*, a case similar to the case at bar, the district court determined that the defendant insurance company was entitled to judgment as a matter of law because it had properly utilized an appraisal process, which was permitted in the insurance contract itself, and had paid the insured all that was determined to be due therein. 625 F. Supp. 2d at 1194-95. The court reasoned:

> [T]his is not the usual bad-faith case where an insurer refused to pay the policy limits when the damages clearly exceed those limits. Defendant had a contractual right under the insurance policy to demand appraisal when the two sides could not reach an agreement as to the amount of damages. Since the extent of damages owed to Plaintiff

> under the policy was still legitimately in dispute, the bad-faith claim was premature . . . . While the law does not preclude the sending of the Civil Remedy Notice, a party cannot file a bad faith suit until there has been a determination of liability and extent of damages owed to the insured.

*Id.* at 1193 (citation omitted). The district court determined that the defendant's response to the CRN was appropriate, reasoning that "[s]ince the appraisal process to determine the extent of damages had already been initiated, it seems logical that the Defendant would want to see the process through instead of caving in to Plaintiff's vague general demands in the Notice." *Id.* at 1194. The court thus entered judgment as a matter of law on the bad faith claim, reasoning as follows:

> If I were to follow Plaintiff's line of reasoning in this case, I would be, in effect, saying that an insurance company is acting in bad faith it if doesn't pay whatever a plaintiff demands when plaintiff files a Civil Remedy Notice. This is not the law. If it were the law, it would make the appraisal process meaningless because every insurer who tried to invoke the appraisal process would be faced with the prospect of a bad-faith suit. An insurance company is entitled to a final determination of how much is owed under a policy before a bad-faith claim can be brought against it so long as the insurer is not exercising its contractual rights to an appraisal in an effort to delay inevitable payment.

*Id.* (citation omitted).

In addition, in *Talat*, the district court held that a party that pays the full amount determined to be due through arbitration is not liable for additional consequential damages even if such consequential damages are demanded in a CRN. 952 F. Supp. 773, 778 (M.D. Fla. 1996). Although the insurer there was able to pay the full amount even prior to the insured's filing of the CRN due to the timing of the award and the notice, the

same reasoning applies here.[2] ProAg paid the full amount of the indemnity determined to be owed by the arbitrator and fully complied with all other requirements within ten days of the award.  To require ProAg to undergo a trial on consequential or punitive damages would eviscerate the arbitration process provided under the Policy, since ProAg and other crop insurers would be forced to choose between paying the full amount demanded by the insured before the arbitrator can rule so as to avoid a bad faith claim, or seeing the arbitration through and paying the amount ultimately determined by the arbitrator, but facing a later bad faith claim when, as here, such determination cannot be made within sixty days of the CRN.  That is not a real solution as required under *Rousso*.

For all the above reasons, Plaintiffs' CRNs failed to meet the requirements and purpose of Section 624.155, Florida Statutes, and thus Plaintiffs' CRNs were not valid, and did not require *any* response.

C.     **Even if Plaintiffs' CRNs were Deemed to Meet the Statutory Requirements, Plaintiffs are not Entitled to a Rebuttable Presumption of Bad Faith.**

Even assuming *arguendo* that Plaintiffs' CRNs were valid, in spite of the absence of a real "cure" opportunity within the Policy, Plaintiffs are still not entitled to summary judgment regarding a rebuttable presumption of bad faith.  It is important to note that the text of Florida Statute 624.155 does not require a response within sixty (60) days, so

---

[2] One Federal district court has held that the bad faith is not cured when the amount due is not paid within sixty days of the notice, even where the parties are engaged in arbitration. *Bullard Bldg. Condo. Ass'n Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 8:08-cv-50-T-30MAP, 2009 WL 2423436, at *3, n.5 (M.D. Fla. Aug. 4, 2009).  Defendant respectfully suggests that this Court should not follow this opinion, which failed to take into account the timing of the arbitration *vis a vis* the civil remedy notice and the "catch 22" facing an insurance provider in such circumstances.  Moreover, the amount of payment demanded by the instant Plaintiffs in their CRNs greatly exceeded the amount determined due by the arbitrator.

there is no statutory requirement which must be strictly construed. Plaintiffs' argument is instead based upon the Florida Supreme Court's *Imhof* decision, wherein the court held that there is a rebuttable presumption where an insurer fails to respond *at all* to an insured's CRN. *Imhof v. Nationwide Mut. Ins. Co.*, 643 So. 2d 617, 619 (Fla. 1994) *receded from on other grounds by State Farm Mut. Auto. Ins. Co. v. Laforet,* 658 So.2d 55, 63 (Fla.1995). Specifically, the court held that: "An insurer's failure to respond within the sixty-day period will create a presumption of bad faith sufficient to shift the burden to the insurer *to show why it did not respond."* *Id.* (emphasis added). Importantly, then, the language of *Imhof* demonstrates that a presumption exists only if the insurer cannot demonstrate why it failed to respond to the CRN. Therefore, the question is whether the circumstances of this case fall within the limited scope of the *Imhof* decision. Here, Plaintiffs are not entitled to summary judgment as to the rebuttable presumption under *Imhof* because (1) ProAg effectively did respond to Plaintiffs' CRNs; and (2) even if ProAg did not appropriately respond, it meets its burden to show why it did not do so, such that the presumption is inapplicable, or at the very least a fact question exists precluding summary judgment.

### 1)   ProAg responded to Plaintiffs' CRNs.

The factual circumstances in the instant case are clearly distinguishable from those in *Imhof.* In that case, the CRN alleged that the insurer had ignored the plaintiff's offer to settle the underlying case for $200,000 and that it had failed to even acknowledge the arbitration provisions of the insurance policy at issue. 643 So. 2d at 618. Notably, the *Imhof* decision did not state that an insurer must file a response with the department in

-12-

order to avoid the presumption. In fact, the Florida Supreme Court noted that "[t]he record does not reflect whether [the insurer] responded *in any way* within the sixty-day period following the notice of violation." *Id.* (emphasis added). The court, in creating the rebuttable presumption, was concerned with the possibility of an insurer avoiding liability for bad faith by ignoring the CRN and refusing to respond. *Id.* Here, the record shows no such lack of response exists; nor is the *Imhof* court's public policy concern triggered.

Plaintiffs demanded arbitration with regard to their 2011 cabbage crop claims on May 1, 2012. (Doc. 1-6, ¶ 7). ProAg filed its Answering Statements on May 16, 2012. (Doc. 1-6, ¶ 8). Six months later, after they were well aware of ProAg's position, Plaintiffs filed the CRNs on or about November 6, 2012. (Doc. 1-8 & 1-9). On the very day that the CRNs were emailed to ProAg's counsel, the undersigned communicated verbally and in writing with Plaintiffs' counsel about preparing a Joint Pre-Trial Statement ("PTS") in which each party would present its "statement of the case." *See* Declaration of Christopher C. Hazelip, attached hereto as Exhibit "3." The RMA investigator was deposed by both parties on November 13, 2012 and reiterated the agency's finding of uninsurability. And, after additional written and verbal communications between counsel, the joint PTS was filed on November 16, 2012. In the joint PTS, each party set forth their respective "statement of case" as to the claims asserted in the arbitration, which were also the basis for Plaintiffs' assertions in the CRNs, made joint stipulations as to certain facts, and each party identified their exhibits and witnesses. *See* Doc. 1-6, ¶ 9; Doc. 11-3. The arbitration hearing was held on

December 11-12, 2012 (Doc. 1-6, ¶ 10), during which the parties' various witnesses, including a corporate representative of ProAg, were examined and cross-examined. Following the arbitration hearing, each party submitted its proposed awards, which again reflected the positions of each party as to the claims asserted. Thus, Plaintiffs were certainly not ignored during the sixty-day period, but were made well-aware of ProAg's position with regard to Plaintiffs' claims.

Moreover, there is no requirement imposed by the Florida Department of Financial Services (the "Department") or Florida Statutes that an insurer's initial response to a civil remedy notice be via the Department's portal. In fact, the Department indicates on its website: "The Department only requires notification of the outcome of the Civil Remedy Notice, and the comments field is intended for this purpose. Intermediate correspondence should be mailed directly to the other party." *See* Fla. Dept. of Fin. Svcs., Civil Remedy Notice of Insurer Violation, *Help/FAQ, How do I add more information or respond to a Civil Remedy Notice?*, available at https://apps.fldfs.com/CIVILREMEDY/Help.aspx (last visited Oct. 7, 2014), a copy of which is attached here as Exhibit "4." Similarly, Section 624.155 provides only that an insurer shall report the disposition of the alleged violation to the Department. Fla. Stat. § 624.155(3)(e). Thus, although ProAg did not file a response to Plaintiffs' CRNs through the Department's portal until February 21, 2014, ProAg did effectively respond to Plaintiffs' counsel via a plethora of "intermediate" correspondence, pleadings, the presentation of evidence during the arbitration proceedings, and post-hearing submissions, all of which clearly delineated ProAg's position.

-14-

While there is no case law interpreting the term "intermediate correspondence," it would seem that written and verbal communication explaining the insurer's position, plus participation in a formal discovery and an arbitration hearing wherein the parties presented the testimony of their representatives and witnesses, and the opposing party cross-examined them, would fairly fall into such a category, especially if construing all reasonable inferences in Defendant's favor as the summary judgment standard requires. And, when the arbitration process was completed, ProAg immediately and fully complied with the award within ten days.  This is simply not the situation presented in *Imhof,* and that case does not require the application here that Plaintiffs are contending.

Moreover, even assuming that it is proper to seek partial summary judgment as to the issue of a presumption (which Defendant does not concede), there remains, at the very least, a factual dispute as to whether ProAg's engagement with Plaintiffs as detailed herein was a sufficient response to the CRNs, thereby precluding summary judgment. *See Lanza v. Schriefer,* No. 09-20834-CIV, 2010 WL 2754327, *1 (S.D. Fla. July 12, 2010) (denying motion for summary judgment seeking to shift burden of proof at trial by creating presumption that plaintiff was negligent where fact issue existed as to whether plaintiff was in compliance with Florida statute at the time of the accident).

> **2)   Even if ProAg did not appropriately respond, the *Imhof* presumption is inapplicable.**

Even assuming *arguendo* that this Court accepted Plaintiffs' contention that ProAg did not appropriately respond to their CRNs, the rebuttable presumption under *Imhof* is still inapplicable because ProAg can demonstrate why it did not respond further than it did.  *Imhof* provides that if an insurer fails to respond, the burden shifts to it to

show why it did not. 643 So. 2d at 619. Implicitly, then, a good faith exception to the *Imhof* presumption exists: if an insurer can sufficiently demonstrate good cause for not responding, no rebuttable presumption of bad faith applies, and if the insurer cannot, the rebuttable presumption would apply at trial. The rebuttable presumption created by the *Imhof* court cannot, therefore, be read to operate akin to some sort of statute of limitations on an insurer's response, as no good faith exceptions exist for statutes of limitations. Rather, an insurer can avoid a rebuttable presumption of bad faith if it can demonstrate why it did not respond. To interpret *Imhof* otherwise would be to effectively ignore the Florida Supreme Court's requirement that the insurer demonstrate why it did not respond to the CRN, *not* why it did not commit bad faith.[3]

As noted above, the *Imhof* court was primarily concerned with the possibility of an insurer avoiding any liability for bad faith by simply ignoring the CRN and refusing to respond, which suggests that the presumption is aimed at willful non-compliance. *See id.* Here, subsequent to the filing of the CRNs, the parties had numerous communications regarding Plaintiffs' claims, including the submission of the parties' joint PTS, participation in discovery and the arbitration hearing itself, and the submission of post-hearing briefs. The failure of ProAg's counsel to state directly to Plaintiffs' counsel during their regular communication and correspondence throughout the sixty-day period that ProAg's repeated expressions of its position was specifically being made in response

---

[3] Plaintiffs also cite to *Oak Casualty Insurance v. Travelers Indemnity Company*, 778 So. 2d 483 (Fla. 3d DCA 2001) in support. That case, however, in a *per curiam* opinion, merely states that the court properly gave a jury instruction pursuant to *Imhof* because the insurer failed to respond within sixty days, without any substantive discussion of the circumstances present there. Thus, that opinion adds nothing to the argument aside from a recognition that the *Imhof* presumption exists.

-16-

to Plaintiffs' CRNs was by no means willful non-compliance with Fla. Stat. §624.155, which by its terms does not even require such a response. Moreover, ProAg's failure to send any additional, designated response was hardly an attempt to avoid liability by ignoring the Plaintiffs' demands; rather, ProAg was dutifully following the dispute resolution procedures set forth in the Policy. The extensive and substantive interaction between the parties after the CRNs outlined herein provides a good faith reason as to why ProAg did not consider it necessary to respond further or in a different manner. *See* Exh. 3, Declaration of Christopher C. Hazelip. For this additional reason, the *Imhof* presumption is inapplicable, or there is at least sufficient factual issue to preclude summary judgment.

Defendant respectfully contends that the Southern District of Florida order issued by Judge Moreno, attached as Exhibit "C" to Plaintiffs' Motion, is not applicable as it appears to deal primarily with issues of notice and agency. Judge Moreno found that the defendant there was properly served and noticed with the CRN, which was apparently the basis for the defendant's argument as to why it did not respond. The scenario described in Judge Moreno's order correlates to the *Imhof* court's concern of an insurer avoiding liability by ignoring a CRN, whereas no such concern is present here. If, as the defendant apparently argued in the action before Judge Moreno, an insurer could avoid liability by ignoring CRNs and arguing that the CRN was delivered not to it, but rather its servicer, the policy concern of the *Imhof* court is directly implicated. The circumstances of the instant action are distinguishable, however, because ProAg was not attempting to avoid liability by ignoring the CRNs, and in fact was highly engaged and in regular contact

-17-

with the Plaintiffs throughout the sixty-day period. Accordingly, ProAg meets its initial burden to show why it did not respond differently, and summary judgment must be denied.

## II.   The Court Lacks Jurisdiction Over Count I.

Plaintiffs also argue that they are entitled to summary judgment as to (1) whether this Court has jurisdiction to review the arbitration award and make a determination in accordance with Section 20(i), and (2) whether Plaintiffs' 20(i) request places the arbitration award in "judicial review" under Section 20(i) of the Policy. A review of the regulations governing the crop program demonstrates that Plaintiffs' requested summary judgment must be denied.

### A.   The Court Lacks Jurisdiction To Conduct Judicial Review Of The Arbitration Award.

Plaintiffs argue that "[t]his Court has jurisdiction to conduct judicial review of the Arbitration Award relative to the standards set forth under the subject policy's §20(i) provision." (Doc. 32, p. 2). In connection therewith, Plaintiffs' assert that the RMA's April 3 letter (Doc. 15-1) "instructs and defers to the court to conduct its review of the Arbitration Awards for purposes outlined in Section 20(i)." (Doc. 32, ¶ 18).

As previously set forth in Defendant's pending Renewed Motion to Dismiss Plaintiffs' Complaint (Doc. 33), the requisite two-part determination under Section 20(i) must be made by FCIC. Plaintiffs do not set forth any authority or basis on which such a determination could be deferred to the Court, nor could they, as each and every regulation related to claims for extra-contractual damages and attorneys' fees arising from a crop insurance policy like those at issue here requires as a condition precedent that such a two-

part determination be issued by FCIC.

The plain language of Section 20(i) dictates that the determination required for extra-contractual damages be made by FCIC, and the agency noted the following in responding to commentary regarding Section 20(i):

> Response: FCIC agrees that insurance providers may have been at risk for punitive or extra contractual damages in litigations even though they may not have violated FCIC's policies or procedures. This risk poses a considerable program integrity issue since it can affect the manner in which insurance providers manage their litigations and could result in increased costs to taxpayers. Therefore, FCIC has revised section 20, and made conforming amendments to 7 CFR 400.176(b) and 400.352(b)(4), to limit the imposition of punitive and other extra contractual damages, attorneys' fees and other costs *to those situations where FCIC has determined the insurance provider violated its policies and procedures and such violation had a monetary impact on the payment of the claim.*

*See* Doc. 11-2 (emphasis added).

The referenced 7 C.F.R. § 400.176, entitled "State action preemptions," provides:

> (b) No policy of insurance reinsured by the Corporation and no claim, settlement, or adjustment action with respect to any such policy shall provide a basis for a claim for punitive or compensatory damages or an award of attorney fees or other costs against the Company issuing such policy, *unless a determination is obtained from the Corporation* that the Company, its employee, agent or loss adjuster failed to comply with the terms of the policy or procedures issued by the Corporation and such failure resulted in the insured receiving a payment in an amount that is less than the amount to which the insured was entitled.

(emphasis added). Similarly, 7 C.F.R. § 400.352(b)(4) explicitly provides that certain state and local laws and regulations are "preempted" so as to prohibit "punitive damages, compensatory damages, or attorney fees ...arising out of actions or inactions on the part of individuals and entities" absent the FCIC's two-part determination.

The RMA's April 3, 2014 letter (Doc. 15-1) or the Managers Bulletin issued on

August 11, 2014, Bulletin No. MGR-14-010 (the "Bulletin"; Doc. 33-2) also do not support Plaintiffs' contention that RMA has or could defer its jurisdiction to the Court to make the requisite 20(i) determination. As this Court has previously observed (Doc. 19), the April 3 letter explicitly provides that RMA will render a decision upon receipt of all necessary information. (Doc. 15-1). It still has not done so. The recently issued Bulletin may purport to adjust the timing of the RMA's 20(i) determination, but not the fact that it is the RMA that must make that determination. Even if the April 3, 2014 letter and the Bulletin can be construed as an attempt by the RMA to defer (or "punt") its determination of the Plaintiffs' Section 20(i) requests pending judicial review, RMA does not attempt to defer the determination itself to the Court, nor could it.

As noted above, the terms and conditions of the Federal crop insurance policies sold by AIPs are prescribed by the FCIC's regulations, *see, e.g.,* 7 C.F.R. §457.8 (Basic Provisions), and "may not be waived or varied in any way by us [the AIP], our insurance agent . . . or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement." *Id.* § 457.8 (Preamble). Even the RMA is not entitled to alter the mandate of the federal regulations beyond the scope of its authority. There is no authority for the agency to contradict the clear meaning of the duly promulgated regulation in this way, nor is there any basis on which it could impose on this Court to issue what would essentially be an advisory opinion. As the agency itself has acknowledged in FAD-99, *"FCIC is responsible for making these determinations* [under Section 20(i)] *to ensure the uniform application of the policies and procedures."* (Doc. 33-3) (emphasis added). Moreover, under the clear mandate of 7 C.F.R. §

400.176(b), irrespective of Section 20(i), no damages such as those sought by Plaintiffs are recoverable unless the two-part determination is obtained from the RMA.

The order of United States District Judge Donald Graham attached as Exhibit "H" to Plaintiffs' Motion actually supports the contention that it is the FCIC that must make the 20(i) determination, not this Court. Although ProAg respectfully disagrees with Judge Graham's conclusion that the action in that case was properly in judicial review, Judge Graham correctly concludes that even if that were true, Plaintiffs must obtain the requisite determination *from the FCIC* that the AIP failed to comply with the terms of the policy, resulting in less of an indemnity than that to which Plaintiffs were entitled. *See* Doc. 32-9, p. 7. Judge Graham was not deciding there that the Court had jurisdiction to make such a determination; in fact, he entered an order staying the case pending the requisite determination by the FCIC, in accordance with the federal regulations. What Plaintiffs request in their Motion, without any basis or authority, is essentially that this Court take jurisdiction and devote its resources and time to issue an advisory opinion to the RMA regarding the two-part determination under Section 20(i). Such a course of action is simply not authorized by the federal scheme at issue, and the Plaintiffs have presented no authority for the contention that the agency can abdicate this responsibility to the Court.

**B.      Plaintiffs' 20(i) Request Does Not Place the Arbitration Award "in Judicial Review."**

Plaintiffs argue that their 20(i) request "satisfies the threshold requirement of §20(i) for judicial review." Doc. 32, p. 3. Contrary to Plaintiffs' assertions, the instant

action does not qualify as a "judicial review" as that term is used in Section 20(i).[4]

Section 20(i) of the Policy provides:

> In a *judicial review only*, you may recover attorneys' fees or other expenses, or any punitive, compensatory or any other damages from us *only if you obtain a determination from FCIC* that we, our agent or loss adjuster failed to comply with the terms of this policy or procedures issued by FCIC *and* such failure resulted in you receiving a payment in an amount that is less than the amount to which you were entitled.

*See* Doc. 1-3, Sec. 20(i) (emphasis added).   On October 21, 2013, the agency issued

FAD-193, which further clarified Section 20(i) as follows:

> An AIP or insured must then complete the arbitration process before seeking resolution of the dispute through judicial review.  An AIP or insured that elects to seek *judicial review of a decision rendered in arbitration* must file suit within one year of the date the arbitration decision was rendered . . . .  The reference to 'judicial review only' is to clarify that such damages can only be sought *during an appeal to the courts, after an FCIC determination has been obtained* and cannot be awarded in arbitration.  To obtain a determination that will enable the insured to recoup attorney's fees, expenses, or damages from the AIP, the insured must send a request for a determination to the RMA Deputy Administrator of Compliance after the insured has filed *an appeal for judicial review*.

*See* Doc. 11-2 (emphasis added).

In its April 3, 2014 letter, the RMA wrote in response to Plaintiffs' request that it

could not issue a decision under Section 20(i) until it was provided "all pleadings, briefs,

and dispositive motions filed by both parties in the arbitration and the litigation.  Once all

the information is provided, FCIC will render a decision."  As this Court observed in the

Order, "[t]he meaning of the phrase, 'all pleadings, briefs, and dispositive motions filed

---

[4] These same issues are also raised in Defendant's Renewed Motion to Dismiss (Doc. 33).

by both parties in the . . . litigation" is not clear, as no litigation could be completed without the condition precedent of a 20(i) determination by the FCIC." Doc. 19, p. 3 n.7.

ProAg acknowledges that the April 3, 2014 letter also indicated that Plaintiffs' submission included the complaint filed in this action "sufficient for us to determine that this case is in judicial review." Doc. 15-1. However, review of the federal regulations and materials promulgated by the RMA makes clear that the instant action is not the type of "judicial review" contemplated by Section 20(i), as clarified in FAD-193. Doc. 11-2. Neither party filed a motion to vacate, modify or correct the award pursuant to Section 11 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §11, within one year, and the instant action is not an appeal for judicial review of the arbitration award. Thus, Plaintiffs have not initiated "judicial review" within the meaning of Section 20(i) of the Policy.

To the extent the April 3, 2014 letter and the Bulletin may be seen as an attempt to change the regulations, such alteration is impermissible. As a general matter, an agency may not, "under the guise of interpreting a regulation, . . . create *de facto* a new regulation." *See, e.g., Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000). More specifically, the terms and conditions of the Federal crop insurance policies sold by AIPs are prescribed by the FCIC's regulations, *see, e.g.,* 7 C.F.R. §457.8 (Basic Provisions), and "may not be waived or varied in any way by us [the AIP], our insurance agent . . . or any employee of USDA unless the policy specifically authorizes a waiver or modification by written agreement." *Id.* § 457.8 (Preamble). As the FCIC has again made clear in the recently issued FAD-211, "no one has the authority to waive or modify the provisions [of the policy] except as authorized in the regulations themselves." Doc. 33-4.

-23-

Defendant acknowledges that FAD-193 (Doc. 11-2) provides a petition for judicial review may be *filed* before the required FCIC determination is obtained, however it also clarifies "that such damages can only be sought during an *appeal* to the courts, after an FCIC determination has been obtained[.]" *See* FAD-193 (Doc. 11-2, p. 3).[5] Thus, although the April 3, 2014 letter and the Bulletin contain arguably ambiguous language, when read in conjunction with Section 20(i) and FAD-193, the only consistent interpretation is that a court must be reviewing an alleged error on the part of the arbitrator and thus an "appeal" of the arbitrator's decision. In that event, it may make sense for the RMA to defer its determination until the court rules on the correctness of the arbitrator's decision. However, no such "appeal" has been presented here, and this action does not involve the type of "judicial review"[6] that is a necessary prerequisite to an award of attorney's fees or punitive or other damages under Section 20(i).

## CONCLUSION

Accordingly, for all of the foregoing reasons, Defendant respectfully requests that Plaintiffs' Motion for Partial Summary Judgment be denied.

---

[5] Generally, the term "appeal" applies to a request for review of a decision that has an adverse impact. *See, e.g., Centennial Bank v. NFP 1, LLC et al.*, 134 So. 3d 569, 570 (Fla. 1st DCA 2014) (noting that "a party lacks standing to seek review of an order that is entirely favorable to its own interests). In this case, Plaintiffs received what they requested in the arbitration. In any case, the Plaintiffs are not challenging the arbitration award.

[6] Only one federal district court within the state of Florida has addressed the "judicial review" process set forth in Section 20. *See Great American Ins. Co. v. Moye*, 733 F. Supp. 2d 1298 (M. D. Fla. 2010). That court has determined, however, that such process does not equate to *de novo* judicial review of the same issues considered by the arbitrator, but would be synonymous with the grounds to vacate an award under the Federal Arbitration Act. *Id.* at 1303 (additional citations omitted).

-25-

RESPECTFULLY SUBMITTED this 8th day of October, 2014.

**ROGERS TOWERS, P.A.**

By: */s/Christopher C. Hazelip*
    Christopher C. Hazelip
    Florida Bar No. 438049
    Cristine M. Russell
    Florida Bar No. 0157406
    L. Javan Grant
    Florida Bar No. 0799521
    1301 Riverplace Boulevard, Suite 1500
    Jacksonville, FL  32207
    (904) 398-3911 (telephone)
    (904) 396-0663 (facsimile)
    Chazelip@rtlaw.com (email)
    Crussell@rtlaw.com (email)
    JGrant@rtlaw.com (email)

    ATTORNEYS FOR DEFENDANT
    PRODUCERS AGRICULTURE
    INSURANCE COMPANY

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 8, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Michael D. Martin, Esquire
Martin Law Office, P.A.
200 Lake Morton Drive, Suite 202
Lakeland, FL  33801
mike@martinpa.com
*Attorneys for Plaintiffs*

William K. Crispin, Esquire
Law Office of William K. Crispin, Chtd.
7401 N.W. 18th Avenue
Gainesville, FL  32605
crispinlaw@gmail.com
*Attorneys for Plaintiffs*

*/s/Christopher C. Hazelip*